IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.  2:14-cv-028 |
| | : | |
| v. | : | |
| | : | |
| FIVE THOUSAND EIGHT HUNDRED SEVENTY-FOUR AND 00/100 DOLLARS ($5,874.00) IN UNITED STATES CURRENCY, | : | |
| | : | |
| Defendant. | : | |

## VERIFIED COMPLAINT FOR FORFEITURE

Now comes the Plaintiff, United States of America, by and through its undersigned attorney, Deborah F. Sanders, Assistant United States Attorney, and respectfully states as follows:

1. This is a civil action in rem brought to enforce the provisions of 21 U.S.C. §881(a)(6), which provides for the forfeiture of the above referenced currency to the United States because it was used or intended to be used in exchange for controlled substances, or represents proceeds of trafficking in controlled substances, or was used or intended to be used to facilitate the trafficking of a controlled substance, in violation of Subchapter I of Chapter 13 of Title 21 and is therefore forfeitable.

2. The Court has jurisdiction over this matter by virtue of 28 U.S.C. §§1345 and 1355.

3. Venue is proper in this District pursuant to 28 U.S.C. §§1355 and 1395.

4. Defendant is Five Thousand Eight Hundred Seventy-Four and 00/100 Dollars ($5,874.00) in United States currency ("Defendant Currency").

5. The Defendant Currency is located within this District having been deposited into the United States Department of Justice Asset Forfeiture Holding Fund.

6. The Drug Enforcement Administration ("DEA") received a claim asserting an ownership interest in the Defendant Currency from Gowan McLin on or about October 18, 2013.

7. The Defendant Currency was seized on August 21, 2013, from Gowan Omar McLin ("McLin") at the Port Columbus International Airport by DEA Task Force Officers Wayne McFarland ("TFO McFarland") and Henry Morehouse ("TFO Morehouse"). On that same date, TFO McFarland received information from a Confidential Source who has proved trustworthy in the past, concerning a man, later identified as McLin, who had booked a same-day one-way ticket on US Airways from Columbus, Ohio, to Oakland, California, through Phoenix, Arizona. Each of these destinations is known to TFO McFarland to be a source and/or destination area for illegal narcotics. Further, narcotic/money couriers will typically purchase one-way tickets to source or destination areas and will often book their ticket within 24 hours of traveling. McLin had arrived in Columbus, Ohio on August 20, 2013, from Oakland, California, at approximately 10:00 p.m. and on August 21, 2013, booked a one-way flight to Oakland less than 24 hours after arrival.

8. After receiving the information from the Confidential Source TFO McFarland used it to conduct a public records search and checked with law enforcement's National Criminal Information Center (NCIC) to see if McLin had a criminal record. TFO McFarland learned that McLin had an extensive criminal history including several arrests for weapons violations and

narcotic related activities; he had most recently been arrested in the San Francisco, California, area on or about May 14, 2013 for felony possession of marijuana for sale.

9. Based on the information obtained from the Confidential Source and McLin's criminal history, TFO McFarland and TFO Morehouse conducted surveillance for McLin. TFOs McFarland and Morehouse proceeded to the US Airways boarding area and observed McLin seated in the area of Gate B-23. They approached McLin from the left and right of his seat so as not to block his egress. The officers identified themselves by displaying their credentials, advised McLin that he was not under arrest or in any trouble, and asked if they could speak to him. McLin nodded his head and replied "yes." TFO McFarland asked McLin where he was traveling to and if he could see McLin's boarding pass and identification. McLin advised he was traveling home to California and handed TFO McFarland his documents. The officers reviewed the documents and promptly returned them to McLin.

10. After verifying McLin's identity TFO McFarland asked McLin if he was in possession of or carrying any illegal narcotics or large amounts of currency in his carry-on bag or on his person. McLin advised he was not and after being asked, consented to a search of his person and bag. Although McLin denied carrying large amount of currency, TFO McFarland searched McLin's person and located a bundle of currency in McLin's pants pocket and another in his wallet. TFO McFarland asked McLin how much money he had. McLin responded that he had no more than $5,000.00. TFO McFarland then began searching the carry-on bag where he located another bundle of currency in the front pocket of a pair of pants. TFO McFarland asked McLin if his estimation of the amount was the total between all bundles and McLin verified that he thought the total was $5,000.00. After discovering the currency, TFO McFarland asked McLin to accompany himself and TFO Morehouse to the DEA office to discuss the currency in

3

his possession. McLin gathered his things and proceeded to follow the officers on his own accord. TFO McFarland also contacted DEA K-9 Task Force Officer Amy Allen to meet them at the DEA Office.

11. Upon arriving at the DEA office, TFO McFarland had McLin empty his pockets, completed another search of McLin's person, and asked him to sit in the interview room. The currency in McLin's pockets appeared to be a bundle of approximately $2,000. In McLin's presence, TFOs McFarland and Morehouse removed the bundle of currency from McLin's wallet, which appeared to be approximately $1,000, and placed it with the currency from McLin's pockets. They also re-searched McLin's carry-on bag and removed the currency which had been previously located and which appeared to be a bundle of approximately $2,000. Typically, narcotic/money couriers will often place bundles in groups of $1,000.00 to $2,000.00 and will often conceal narcotic proceeds in multiple locations, to avoid detection or draw attention to them by law enforcement. The total currency found on McLin's person and in the carry-on bag totaled $5,874. No other currency or illegal narcotics were found.

12. Upon being questioned about his travel to Columbus, McLin provided TFO McFarland with several different answers or refused to provide him with specific verifiable information. McLin initially advised TFO McFarland that he arrived in Columbus the previous night, August 20th, to visit family. However, he did not respond when he was asked which family members lived in Columbus, Ohio. TFO McFarland asked McLin general questions about his family, but McLin did not provide any information.

13.     As the interview continued, McLin advised TFO McFarland that he flew into Columbus on August 20, 2013 around 9:00 or 10:00 p.m. on a one-way ticket aboard US Airways.  This time, instead of saying he was in Columbus to visit family, he advised that he rented a car from Budget Rental and then drove to Cincinnati, Ohio.  When asked where he had gone in Cincinnati, Ohio, McLin changed his story again and said he did not know the address, and that an individual named "Mike" took him.  TFO McFarland asked McLin who Mike was.  McLin advised he had known Mike for "years," but did not know Mike's last name.  He also advised that he knew Mike's address and phone number but did not want to disclose that information.  McLin then advised that Mike knew where they were going and that he left his rental car at Mike's residence and rode with Mike to Cincinnati.  They arrived in Cincinnati around 12:30 or 1:00 a.m. and went right to recording.  McLin advised the studio was in a converted house but was unable to provide the address or a description of the house.

14.     TFO McFarland continued to interview McLin about the source of the money he carried with him.  McLin advised that he always had money with him, that he had brought $3,000.00 with him, but when asked did not say where the $3,000.00 came from.  He did advise that he was paid $2,000.00 for assisting a group, The Untouchables, complete some recordings.  McLin advised that he owned his own record business, Critical Records, and that he also worked in construction.

15.     McLin told TFO McFarland that he had owned Critical Records since 2001 and that he was a producer, engineer, rapper/artist, and a promoter.  He did not provide a website for his business but advised that he had videos posted on the internet website YouTube under

5

"FriscoCritical."[1]  McLin further advised that he promoted different types of music, including "R&B," rap, and "Battle Rappers," worked with artists known as D-Ray, Ace, T-Mack, and The Untouchables, and that he rapped under the name "G-Man."  TFO McFarland also asked McLin if he used an "EIN", Employer Identification Number, for his business.  McLin advised he used one but did not know the number.  McLin initially advised that he filed taxes but advised he was unsure of the total gross income.  However, as TFO McFarland asked McLin for more information, McLin advised he made $800.00 to $1,000.00 a week gross and that he paid taxes.  He also advised that he did not have any upcoming "gigs," specific deals, or play dates at the time of the interview.

16. TFO McFarland asked McLin about his work in construction as well.  McLin advised that he has worked as a carpenter's apprentice since 2000 and was a member of the Local 22 Carpenters Union, but was unable to give the cost of dues.  He provided that he had done pre-apprentice work in 1999 at a school called VV Jet of San Francisco and completed a three (3) month program.  McLin went on to advise that he did wood and steel framing construction work and worked for a company named Trico Construction for a few months in 2013 before being laid off and earned $22.00 per hour.  He stated he also worked for them in 2001-2002.  McLin's statements about his recent work history were false.[2]

17. When TFO McFarland finished his interview, he asked McLin if there was any reason that a trained narcotic detection K-9 would alert to the odor of narcotics on the currency.

---

[1] After speaking with McLin, TFO McFarland performed a search for "FriscoCritical" on the website www.YouTube.com and located the videos McLin had referenced.  TFO McFarland did not locate any current videos and noted that most of the videos were from 2010.

[2] On or about August 22, 2013, TFO McFarland contacted Trico Construction and requested information on McLin's employment with the company.  Trico advised that McLin worked for the company from December 30, 1999, to February 25, 2000, and earned $15.19 per hour.  They advised that that was the only time that McLin worked for the company.

McLin replied that "all money has odor" then referred to TFO McFarland and stated "your money has odor." TFO McFarland placed the currency in a USPS Flat Rate box and sealed it in McLin's presence. TFO McFarland set up ten (10) USPS Flat Rate boxes: five (5) of the boxes were empty and five (5) contained shredded circulated currency. DEA K-9 Task Force Officer Amy Allen ("TFO Allen") with narcotics K-9 Regan conducted a sniff of the ten (10) boxes. K-9 Regan did not show a change in behavior to any of the ten (10) boxes. TFO Allen and K-9 Regan then left the area. TFO McFarland replaced one of the boxes with the box that contained the currency from McLin's person and bag. TFO Allen with K-9 Regan returned to the room and conducted a sniff of the boxes. K-9 Regan showed a positive alert for the odor of narcotics on the box containing the currency by sitting next to the box. TFO McFarland advised McLin of the positive alert. McLin responded, "no way the dog alerted."

18. TFO McFarland advised McLin that due to his inconsistent story, evasive answers, the positive narcotic K-9 alert, and other factors associated with narcotic/money carriers, the currency was being administratively seized by the DEA. McLin provided TFO McFarland with his address and telephone number and was given a DEA-12 receipt for an undetermined amount of currency which was later determined to be $5,874.00 (Defendant Currency) in the following denominations:

|  |  |  |  |
|---|---|---|---|
| $100.00 | x  8 | = | $800.00 |
| 50.00 | x  21 | = | 1,050.00 |
| 20.00 | x  192 | = | 3,840.00 |
| 10.00 | x  15 | = | 150.00 |
| 5.00 | x  5 | = | 25.00 |
| 2.00 | x  2 |  | 4.00 |
| 1.00 | x  5 | = | 5.00 |
|  |  | Total: | $5,874.00 |

19.	As part of his subsequent investigation, TFO McFarland obtained records for McLin's recent flight history with US Airways. The records revealed that four (4) of his tickets were purchased on the same-day as his flight; that the majority of his other flights were booked within 48 hours of the flight date; and, that all flights were booked one-way:

| Flight Date | Booked Date | Origin | Destination | Via |
|---|---|---|---|---|
| 12/17/11 | 12/17/11 | Fort Lauderdale, FL | San Francisco, CA | Charlotte, NC |
| 2/1/12 | 2/1/12 | Columbus, OH | San Francisco, CA | Phoenix, AZ |
| 2/22/12 | 2/15/12 | Sacramento, CA | Columbus, OH | Denver, CO |
| 2/28/12 | 2/26/12 | Sacramento, CA | Columbus, OH | Phoenix, AZ |
| 4/15/12 | 4/8/12 | San Francisco, CA | Columbus, OH | Charlotte, NC |
| 5/30/12 | 5/22/12 | San Francisco, CA | Cincinnati, OH | Charlotte, NC |
| 6/6/12 | 6/5/12 | Cincinnati, OH | San Francisco, CA | Charlotte, NC |
| 7/31/12 | 7/30/12 | Columbus, OH | Fort Lauderdale, FL | Charlotte, NC |
| 9/27/12 | 9/20/13 | San Francisco, CA | Pittsburgh, PA | Philadelphia, PA |
| 2/21/13 | 2/20/13 | San Francisco, CA | Cincinnati, OH | Philadelphia, PA |
| 3/15/13 | 3/6/13 | Fort Lauderdale, FL | San Francisco, CA | Phoenix, AZ |
| 6/12/13 | 6/5/13 | San Francisco, CA | Columbus, OH | Philadelphia, PA |
| 6/18/13 | 6/18/13 | Columbus, OH | Oakland, CA | Charlotte, NC & Phoenix, AZ |
| 7/17/13 | 7/15/13 | Oakland, CA | Columbus, OH | Phoenix, AZ |
| 7/23/13 | 7/18/13 | Columbus, OH | Oakland, CA | Phoenix, AZ |
| 8/20/13 | 8/18/13 | Oakland, CA | Columbus, OH | Phoenix, AZ |
| 8/21/13 | 8/21/13 | Columbus, OH | Oakland, CA | Phoenix, AZ |

20.	TFO McFarland also obtained records detailing incoming and outgoing calls on the cellular telephone number McLin gave as his contact number. A review of the records revealed that McLin in fact had three (3) cellular telephone numbers active with AT&T. During the subsequent investigation of the numbers listed in the call logs, TFO McFarland discovered

that several of the telephone numbers calling and/or being used by McLin are linked to past and present narcotics investigations with the DEA.

21. The United States alleges that the Defendant Currency constitutes money or other things of value furnished or intended to be furnished in exchange for a controlled substance, or represents proceeds of trafficking in a controlled substance, or was used or intended to be used to facilitate one or more violations of 21 U.S.C. §841 et seq., and is therefore forfeitable pursuant to 21 U.S.C. §881(a)(6).

WHEREFORE, Plaintiff, the United States of America, respectfully requests:

(a) That the Court find probable cause to believe that the Defendant Currency is forfeitable to the United States of America under 21 U.S.C. §881(a)(6);

(b) That under 21 U.S.C. §881(b), 18 U.S.C. §981(b), and Supplemental Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the Court issue a Warrant of Arrest in Rem for the arrest and seizure of the Defendant Currency based on this verified complaint, to bring the Defendant Currency within the jurisdiction of the Court for purposes of this statutory forfeiture action;

(c) That notice of this action be given to all persons and entities known or thought to have an interest in or right against the Defendant Currency, to appear and show cause why the forfeiture should not be decreed;

(d) That notice of this action be given by advertising in accordance with Rule G(4) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions;

(e) The Court decree that forfeiture of the Defendant Currency to the United States of America is confirmed, enforced, and ordered;

(f) The Court order the United States Marshals Service to dispose of the Defendant Currency as provided by the law;

(g) That Plaintiff be awarded its costs and disbursements in this action; and such other relief as this Court deems proper and just.

Respectfully submitted,

CARTER M. STEWART
United States Attorney

DEBORAH F. SANDERS (0043575)
Assistant United States Attorney
Attorney for Plaintiff
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614)469-5715
Fax: (614)469-5240
Deborah.Sanders@usdoj.gov

VERIFICATION

I, Wayne A. McFarland, am a Task Force Officer with the Drug Enforcement Administration, and the agent assigned to this case. I have read the contents of the foregoing complaint for forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10 day of January, 2014.

WAYNE A. MCFARLAND
Task Force Officer
Drug Enforcement Administration